**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

In re:                                                          )
                                                                    )
BLUE DOG AT 399 INC.,                          )          Case No. 15-10694-MEW
                                                                    )
                         Debtor.                          )
                                                                    )
---------------------------------------------------------X
BLUE DOG AT 399 INC.,                          )
                                                                    )
                         Plaintiff,                        )
                                                                    )
                         v.                                   )          Adv. Proc. 15-01097-MEW
                                                                    )
BP 399 PARK AVENUE LLC,                     )
                                                                    )
                         Defendant.                    )
_____)

**BENCH DECISION REGARDING MOTIONS BY SEYFARTH SHAW LLP (1) TO
WITHDRAW AS COUNSEL, (2) TO ASSERT A RETAINING LIEN, AND (3) TO
ENFORCE A PURPORTED SETTLEMENT REGARDING THE FOREGOING**

A P P E A R A N C E S :

WEINBERG ZAREH MALKIN PRICE LLP
New York, New York
*Counsel for Blue Dog at 399 Inc.*
        By: Omid Zareh, Esq.

SEYFARTH SHAW LLP
New York, New York
*Counsel for Seyfarth Shaw LLP*
        By: Edward M. Fox, Esq.
               Owen Wolfe, Esq.

UNITED STATES DEPARTMENT OF JUSTICE
New York, New York
*Counsel for the United States Trustee*
        By: Greg M. Zipes, Esq.

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

This Bench Decision reflects rulings that were first announced in open court on June 23, 2017 in the Chapter 11 case of Blue Dog at 399 Inc.

I have two matters before me for decision.  Each of them relates to the request by the firm of Seyfarth Shaw LLP to withdraw as counsel to Blue Dog.

Seyfarth was retained to represent Blue Dog in litigation against BP 399 Park Avenue LLC. To oversimplify a bit, that litigation involves claims by Blue Dog that the purported termination of its lease was invalid and that Blue Dog's tenancy should be restored.  As I will describe more fully in a moment, the Seyfarth firm agreed when it was retained that Blue Dog would be its client, but that Blue Dog itself would have no obligation to pay Seyfarth's fees.  Instead, Seyfarth agreed that it would look only to Blue Dog's equity owner, Elizabeth Slavutsky, for payment.

This matter was set for trial a few months ago when the parties at the last moment suggested they might be able to work out a settlement.  They attended a mediation session supervised by Judge Garrity, and I understand that they tentatively reached agreement on settlement terms. However, something went wrong and the deal fell apart.  Apparently a serious rift also developed between Ms. Slavutsky and the Seyfarth firm, to the point where the Seyfarth firm says that it cannot work with the Debtor any longer and should be permitted to withdraw.

I have not ruled on the motion for permission to withdraw.  Two issues have arisen in connection with the proposed withdrawal.

First, Seyfarth contends that it has not been paid by Ms. Slavutsky for the services it has rendered since November 2016.  It asks permission to assert a so-called retaining lien on the files that it holds, and wants to refuse to turn over those files to Blue Dog and to Blue Dog's other counsel unless and until Seyfarth is paid the amounts it is owed.

2

Second, Seyfarth contends that Blue Dog agreed to settle the issues relating to the retaining lien when the parties were before me on May 17, 2017. Seyfarth contends that terms that were outlined in open court that day are legally binding upon the Debtor, Blue Dog, and should be enforced by me.

I will describe the facts relevant to that second issue in a moment, but I should first review the terms of Seyfarth's retention.

The retention application was filed on May 18, 2016. It is docket number 60 on the docket for the Blue Dog case, which is case number 15-10694 (together with the exhibits attached thereto, the "Retention Application"). The Retention Application made clear, in numerous ways, that Seyfarth would represent the Debtor, but that it would do so without cost to the Debtor and with the understanding that it could look only to Ms. Slavutsky for payment of its fees. The engagement letter, attached as an exhibit to the Retention Application, said explicitly that "[o]ur fees for acting as special litigation counsel for Debtor will be paid by Elizabeth Slavutsky personally, not Debtor, and Elizabeth Slavutsky will be liable for any fees or costs incurred in connection with this engagement." Paragraph 23 of the application seeking approval of the retention similarly stated that:

> Subject to the Court's approval of this Application, the Firm will be compensated for the services it renders to the Debtor, and will be reimbursed for expenses it incurs, in connection with the Matter solely by payment directly from Debtor's principal, Ms. Slavutsky at no cost to the Debtor's estate under a retention agreement with the Debtor, pursuant to which Ms. Slavutsky has agreed to be solely and personally liable for the Firm's fees and expenses.

*Id.* at 8. Ms. Slavutsky submitted a supporting declaration, and in paragraph 8 she confirmed that she had no intention of making a claim for reimbursement from the Debtor of fees she would pay to Seyfarth. *Id.* at 29.

Mr. Zuckerman submitted an affidavit on behalf of the Seyfarth firm in connection with

the retention, and in paragraph 10 he stated:

> The Firm has agreed with Debtor that the Firm will be compensated for
> services rendered to Debtor, and will receive reimbursement of expenses
> incurred, under this engagement solely by payment directly from Debtor's
> principal, Ms. Slavutsky at no cost to the Debtor's estate under a retention
> agreement with Debtor, pursuant to which Ms. Slavutsky has agreed to be
> solely and personally liable for the Firm's fees and expenses, a copy of which
> has been submitted herewith.

*Id.* at 17.  In paragraph 22 of that same affidavit Mr. Zuckerman confirmed that the Seyfarth firm

"will be compensated for the services it renders to the Debtor, and will be reimbursed for expenses

it incurs, in connection with the Matter solely by payment directly from Debtor's principal, Ms.

Slavutsky at no cost to the Debtor's estate under a separate agreement with Ms. Slavutsky . . .".

*Id.* at 21.

Each of these terms confirmed that the payment obligations would belong to Ms. Slavutsky.

Other terms made clear that although Ms. Slavutsky would make payments, it was the Debtor, not

Ms. Slavutsky, who was to be the client for whom the Seyfarth firm would work.  Paragraph 7 of

the Slavutsky Declaration, for example, confirmed that Ms. Slavutsky understood that the

undivided loyalty of the Seyfarth firm would be to its client, the Debtor.  *Id.* at 29.  Paragraph 22

of the retention application stated: "[t]he Debtor contemplates that the Firm will render legal

services to the Debtor in connection with the Matter as needed throughout the course of this

Chapter 11 case."  *Id.* at 8.  The engagement letter was signed by Ms. Slavutsky on behalf of Blue

Dog and it stated expressly that Blue Dog would be the client and that Seyfarth's representation

of Blue Dog "does not give rise to a lawyer-client relationship between our Firm and any of the

Debtor's [*sic*], officers, directors, shareholders, corporate affiliates or subsidiaries."  *Id.* at 24.

Importantly, there was no indication, or even any hint, in the retention agreement or in the

retention motion papers that the Seyfarth firm's work for the Debtor, or the Debtor's access to the

4

firm's files, was conditioned on payments by Ms. Slavutsky. To be fair, the Seyfarth firm reserved the right on page 2 of the retention agreement to seek to discontinue the relationship if its retainer were used up and not replenished. *Id.* at 2. However, there is nothing in the agreement that purports to restrict the Debtor's right to have access to Seyfarth's files in the event of such a termination or in the event of non-payment by Ms. Slavutsky, or that purported to divide files that the Seyfarth firm had between files that allegedly belonged to the Debtor and others that allegedly belonged to Ms. Slavutsky. Instead, the arrangement contemplated that the Seyfarth firm should make all of its resources available to the Debtor with the understanding that only Ms. Slavutsky would have a payment obligation.

As I noted, the Seyfarth firm now seeks to withdraw as counsel. The Seyfarth firm initially asked for permission to assert a so-called charging lien under the provisions of Section 475 of the New York Judiciary Law. However, that part of the application has been withdrawn, and Seyfarth reconfirmed that withdrawal at a hearing on June 16. Seyfarth still contends that it is entitled to a so-called common law retaining lien on its files, and as a result it has not turned over those files to Blue Dog or to Blue Dog's other counsel.

Seyfarth contends that I do not need to consider the merits of its assertion of a retaining lien and that I should hold instead that Blue Dog and other parties are bound by the terms of a tentative settlement that was announced in open court on May 17. Mr. Fox, of the Seyfarth firm, stated that day that the parties had reached an agreement that the Debtor's estate would be responsible for any unpaid fees owed to the Seyfarth firm, subject to proper application and subject to parties' rights to object to the reasonableness of the fees sought under the normal standards applicable under Section 330 of the Bankruptcy Code. Seyfarth in turn would turn over all its files for the matter to Blue Dog's other counsel.

I was told at that time that the arrangement was to be documented and was to be accomplished by the preparation and submission of a revised retention order for the Seyfarth firm which would document the new payment arrangement, as well as the submission of a proposed separate order permitting the withdrawal of the Seyfarth firm as counsel, which was presumably supposed to include whatever the parties' agreements were as to the turnover of files. However, I made it very clear on May 17 that I would not approve any proposed arrangement that day and that any proposed settlement would have to be submitted for approval in a motion with notice to all creditors and an opportunity to object. Furthermore, even if all parties and creditors agreed, the settlement would still have been subject to a ruling by me as to whether I would permit the settlement to proceed.

It should be noted that when I announced on May 17 that I would not approve a settlement that day and would require further proceedings the United States Trustee made quite clear that it had only been willing to support the proposed settlement on the condition that files would be turned over in a very short time, if not immediately. The U.S. Trustee explained that if the files were not being turned over right away it no longer supported a settlement. Mr. Zipes stated:

> We're here today . . . part of this settlement assumed that there would be a turnover of these files partly so that this case can be move forward. I was prepared to go forward today on my arguments. If we're going to wait a month and a half before -- and Seyfarth is going to make some more arguments a month and a half from now that they don't have to turn over their files until settlement is approved then I'm not sure why we're not going forward today at this point . . . My understanding was that the files would be turned over today, or if not today very quickly.

Oral Argument at 11:00:16 AM, Blue Dog at 399 Inc. v. BP 399 Park Avenue LLC (May 17, 2017) (Adv. Proc. 15-1097) (the "May 17 Hearing Recording"). I nevertheless confirmed again that I would not approve a settlement on May 17th. I explained that "I can't approve a settlement today -- I won't, that's not going to happen. Creditors haven't been told about it, they have a right to be

6

heard.  So that's simply not going to happen, there has to be notice." May 17 Hearing Recording, at 11:01:01 AM.  I also stated during that May 17th hearing that:

> I can't do anything to loosen the hold on the files while you're proposing a settlement until that's noticed to creditors and until they have a chance to be heard, at which point either I'll approve the settlement and you'll get the files that way or I will make a ruling on whether you can have them or not.

May 17 Hearing Recording, at 10:58:55 AM.

My comments on the record on May 17 make it abundantly clear that I had not considered the proposed settlement to be a complete and done deal and that the terms of the proposed settlement had not yet been approved by me.

No settlement arrangement has been submitted for approval by motion of the Debtor, and the Debtor did not send notice to creditors.  Mr. Fox of the Seyfarth firm stated in court on June 16 that when the parties sat down to try to document their agreement it became clear that there were details that had not been resolved, that had not been the subject of the limited descriptions of the arrangement that had been made in open court, and about which the parties ultimately were unable to reach an agreement.

The Seyfarth firm nonetheless contends that the debtor is legally bound by the terms of the agreement that were outlined during the hearing on May 17.  It has filed a motion asking me to approve those settlement terms under Rule 9019 of the Federal Rules of Bankruptcy Procedure. The United States Trustee has objected, and at least one creditor in the case appeared in court on June 16 to note that it objected to the proposed terms.  Seyfarth argues that Blue Dog itself is bound even if my approval was still needed, and that Blue Dog has no right to try to back out of the deal.

Putting aside for just a moment the question of whether the debtor, Blue Dog, has a right to back out or to object to the proposed deal, it should be clear and undisputed that I did not approve the settlement, and that unless I do so there is no binding settlement agreement.  This is a

7

bankruptcy case.  The debtor has no authority to make settlements, at least in matters of this kind, without court approval.  Furthermore, a motion for approval of a settlement must be made on notice to creditors.  *See, e.g., In re Leslie Fay Cos.,* 168 B.R. 294, 305 (Bankr. S.D.N.Y. 1994) ("Compromises may not be made in bankruptcy absent notice and a hearing and a court order.")  I stated in the most unequivocal terms on May 18 that I was not approving a settlement and would not consider a settlement on that day, and that any settlement would have to be presented for approval after notice to creditors who would have the right to object.

It is particularly clear that my approval is needed given the issues involved in this particular matter.  Seyfarth's representative stated on May 17 that he contemplated that the parties would agree to the terms of an order that would modify the terms under which the Seyfarth firm had been retained as counsel.  The terms of counsel retention, including any modification to those terms, plainly require court approval under Sections 327 and 328 of the Bankruptcy Code.  Seyfarth's representative also stated on May 17 that the parties would prepare an order permitting the Seyfarth firm to withdraw as counsel and describing the terms and conditions of that withdrawal.  Under the local rules a withdrawal of counsel also requires Court approval.  *See* S.D.N.Y. LBR 2090-1(e).

Accordingly, nothing that happened on May 17 could possibly have given rise to a completed settlement agreement.  No settlement did or could have become final unless and until my approval was obtained, which did not happen.

It also is (or at least should be) undisputed that at least one of the parties to the purported settlement, the United States Trustee, did not give its full and final assent to the proposed settlement on May 17.  To the contrary: the United States Trustee stated that it was not agreeing

to a settlement unless there were an immediate or nearly immediate turnover of files, which did not happen.

Seyfarth argues that even if my approval was needed or the approval of the U.S. Trustee was not obtained, the Debtor itself is still bound by the terms that were announced in open court, and that the Debtor should be barred from complaining about the deal. I think that argument is incorrect for two reasons.

First, even outside of bankruptcy the purported agreement would not have been enforceable against Blue Dog. It is well settled under New York law that the key to the formation of a contract is not just an agreement on terms but also an agreement to be legally bound by those terms. If parties agree to terms but also make clear through their words or their conduct that they intend to reduce their agreement to writing and do not intend to be bound unless and until such a writing has been finalized, then no binding contract exists. *See Powell v. Omnicom*, 497 F.3d 124, 129 (2d Cir. 2007) ("Parties who do not intend to be bound until the agreement is reduced to a signed writing are not bound until that time"); *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) ("[I]f either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract"); *Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 322 (2d Cir. 1997) (same).

In this case it was abundantly clear that the terms the parties announced in open court were not even a full expression of the terms of their agreement, let alone a full and legally binding statement of such terms. The parties informed me that they intended to draft proposed amendments to the Seyfarth retention order and to draft a separate order laying out the terms of Seyfarth's withdrawal as counsel. Seyfarth's representative, Mr. Fox, conceded in the presentation made to

the Court on June 16 that the parties intended to prepare written agreements, and that such agreements intended to cover issues that were not discussed on the record on May 17. He also conceded on June 16 that the parties never did reach a full and complete agreement on those other open issues. This account of the parties' own discussions makes clear that the parties did not think they had already reached a complete agreement on terms to which they intended to be bound. *See Winston*, 777 F.2d at 82-83 ("Where, as here, counsel insist on continually redrafting the specific terms of a proposed agreement, the changes made must be deemed important enough to the parties to have delayed final execution and consummation of the agreement"); *Johnson v. Fordham University*, 11-CV-04670, 2016 WL 450424, at *5 (S.D.N.Y. Feb. 4, 2016) (further negotiations and changes to an agreement are evidence of an intent not to be bound until the agreement is reduced to writing).

In short, Seyfarth's motion is not really a legitimate effort to enforce an existing legally binding obligation. Instead, it is an effort to impose an obligation based on tentative and incomplete terms that were only partially disclosed in open court. Further, such terms were discussed under circumstances that made clear that no binding agreement had yet been reached, and that a binding agreement would require both a further writing and further proceedings.

There have occasionally been cases where parties have expressly stated and acknowledged their intent to be bound by terms that are announced in open court even in the absence of a more complete written statement. *See Powell*, 497 F.3d at 131; *Role v. Eureka Lodge No. 434*, 402 F.3d 314, 315-16 (2d Cir. 2005); *Milner v. City of New York*, 2012 U.S. Dist. LEXIS 176151, at *1-2 (S.D.N.Y. Dec. 10, 2012). But that was not the case here. The proposed settlement was a tentative one based on incomplete terms, not a fully baked and enforceable deal to which the parties had already agreed to be bound.

10

Second, I am troubled by Seyfarth's suggestion that a debtor that has entered into a settlement is barred from speaking up if prior to Court approval the debtor no longer believes the settlement is a good idea.

The debtor acts as a fiduciary in a bankruptcy case. *See CFTC v. Weintraub*, 471 U.S. 343, 355 (1985). A debtor also has a duty of candor to the Court. Settlements are not supposed to be approved unless, among other thing, they represent a reasonable exercise of the debtor's business judgment. *See In re Motors Liquidation Co.*, 555 B.R. 355, 365 (Bankr. S.D.N.Y. 2016) (noting that when a Court independently reviews whether to approve a settlement "the business judgment of the debtor in recommending the settlement should be factored into the court's analysis"). The notion that a debtor should be forbidden to speak if it no longer thinks that a settlement is proper, and if it no longer thinks in its business judgment that a settlement should be approved, amounts to a suggestion that a debtor is estopped from fulfilling its fiduciary duty and estopped from complying with its duty of candor to the court. In that regard the suggestion is absurd. *See In re Sparks*, 190 B.R. 842, 845 (Bankr. N.D. Ill. 1996) (noting that coercing a debtor to pursue a settlement agreement that it no longer supports "would pit the debtor in a conflict between his fiduciary duty to the estate and the duty to go forward with the agreement"). A debtor not only has the right to tell the court what the debtor thinks, it has an ongoing duty to do so.

Now there may be cases in which a debtor has had a change of heart but in which a court nevertheless decides that the debtor should be bound by a prior deal for one reason or another. There may also be cases in which a debtor should be required to present a settlement for court approval even if the debtor has had a change of heart. Seyfarth has cited some decisions in which courts have taken that view. But it goes much too far to suggest that the debtor cannot even inform the court of the debtor's own current view.

11

In the end, however, I need not decide whether the debtor can or cannot oppose the tentative settlement or whether the debtor must itself sponsor a motion for approval of it. For the reasons I will make clear in a moment I do not approve of the proposed terms of settlement. I believe they are unreasonable and not in the best interest of the estate or its creditors. For that reason I deny Seyfarth's motion for approval of the settlement, and I would have denied approval of the settlement even if the debtor itself had been bound by it and even if the debtor itself had continued to pursue that settlement.

The request by Seyfarth to enforce a purported agreement to a modification to Seyfarth's retention terms, as well as the request for leave to withdraw based on the purported terms of the settlement, are therefore denied.

Turning now to the asserted retaining lien: New York courts have recognized that clients have "an expansive general right . . . to the contents of the attorney's file, upon termination of the attorney-client relationship," and that such right is not subject to a work product privilege. *Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn*, 91 N.Y.2d 30, 36 (N.Y. 1997). However, an exception has been provided as a matter of common law for the assertion of a so-called retaining lien. Retaining liens under common law permit an attorney to obtain a lien "on a client's files, papers, and property in the attorney's possession" unless the client satisfies its obligation to pay fees. *Su San Kwek v. Lei Zhou*, 2015 N.Y. Misc. LEXIS 1497, at *3 (N.Y. Sup. Ct. 2015). New York courts have held that:

> It is well settled that where a client requests that papers in the possession of his former attorney be returned to him, and the attorney asserts a claim for compensation for services rendered, the attorney is entitled to . . . an immediate hearing to determine the amount of the outgoing attorney's lien, if any, and to condition the turnover of the file upon either the payment of the sum thereby found to be due from the defendant to her former attorney or the posting of security therefore [*sic*].

*Renner v. Chase Manhattan Bank*, 2000 U.S. Dist. LEXIS 16150, at *2-3 (S.D.N.Y. Nov. 2, 2000) (internal citations and quotation marks omitted).

Note, however, that the very statement of this common law right makes clear that the theory of the common law retaining lien is that an attorney may retain the products of his or her work until the client has satisfied the client's own payment obligations. Here, the client has no payment obligation. Seyfarth agreed instead to work under an unusual and very different kind of arrangement. Seyfarth agreed that the Debtor would be its client but that Seyfarth would look only to Ms. Slavutsky for payment. Seyfarth also affirmatively represented to me that the Debtor itself would have no responsibility for fees. In short, Seyfarth wants to assert a lien on the Debtor's files in order to secure an obligation owed by another party, even though Seyfarth explicitly and in advance agreed not to look to the Debtor itself for any fees that are owed.

A somewhat analogous situation arose in *E.W. Howell Co. v. Facilities Corp.*, 139 Misc.2d 796 (N.Y. Sup. Ct. 1988). There an insurance company retained counsel to represent two individuals. *Id.* at 797-98. When counsel later withdrew it sought to hold back the papers in its file. *Id.* at 797. The defendants argued that although the lawyer had represented them, the payment arrangement was with the insurance company, and so the attorney could not withhold their papers as a way of trying to force payment of his fees. *Id.* The court held that the attorneys could look only to the insurer for payment, and therefore could not assert a retaining lien on the property of the individual clients to try to compel payment. *Id.* at 798.

The court reached a similar decision in *Brenner v. Miller*, 467 N.Y.S.2d 123 (N.Y. Sup. Ct. 1983). There, an attorney who had been retained by an insurer to represent the defendant sought to assert a retaining lien on the defendant's files based on the insurer's failure to pay fees. *Id.* at 124. The Court held that "[s]ince the defendant insured is not obligated to pay the fee of

prior counsel retained by the insurer, there is no basis to assert and enforce a retaining lien against defendant." *Id.* at 124.

Similarly here, Seyfarth's payment arrangements were solely with Ms. Slavutsky. It may not assert a retaining lien on the Debtor's files to try to compel payment.

In theory, I suppose, Blue Dog might have agreed to the assertion of a retaining lien in the event that Ms. Slavutsky did not pay the Seyfarth firm's fees. However, all terms of a professional's retention required my approval pursuant to Sections 327 and 328 of the Bankruptcy Code. There was no agreement in this case that a retaining lien could be asserted, preventing the Debtor from having access to the files in the event Ms. Slavutsky did not make payment. In fact, the contract had the opposite effect. The whole presentation was meant to assure me that the arrangement was risk-free to the Debtor and that the burdens and problems associated with payment would be borne only by Ms. Slavutsky. The premise of the purported retaining lien is that the Debtor itself has a responsibility and burden to see that fees are paid, but that whole notion is flatly contrary to the representations that were made and contrary to the explicit terms upon which I confirmed the Seyfarth retention.

Furthermore, the reliance on the common law theory of quantum meruit -- the idea that the Debtor should bear a burden because the Debtor received the benefit -- are inapposite here because in this case the parties explicitly disclaimed that the Debtor would have any liability for fees. Quantum meruit is a way of imposing an implied quasi-contractual obligation, and it would be wholly improper to rely on such notions when the parties made an explicit contract and when the contract makes clear that the debtor would have no obligation with respect to payment. *See Bretillot v. Burrow*, 2015 U.S. Dist. LEXIS 121336, at *46-48 (S.D.N.Y. June 30, 2015) (collecting cases supporting the proposition that recovery on a quantum meruit basis requires "a

14

reasonable belief that the person or entity for whom the services were performed would be the one responsible for payment").

Seyfarth has argued in its papers that there were undisclosed terms that inadvertently were not attached to the retention papers and that I should treat those undisclosed terms as though I had approved them as reasonable under Section 328 of the Bankruptcy Code, even though I did not even know about them. This is a preposterous notion. Terms of a debtor's retention of professionals are not binding unless they are presented to the court and approved as reasonable. Reasonable terms have to be disclosed, not hidden. It is self-evident that terms cannot be treated as having been approved by a court if they have not even been presented to the court.

Seyfarth also argues that the rule confirmed in the *E.W. Howell* and *Brenner* decisions should not be applied here, because in this case there was a closer working relationship between counsel and the client than there was in those cases. In support of that argument it has cited to the decision in *Bretillot, supra*. In *Bretillot*, the plaintiff in a pending litigation was informed by counsel of record that additional counsel should be hired to address copyright issues. *Id.* at *4. The plaintiff consented. *Id.* The plaintiff then gave a check to counsel of record with the understanding that the check would fund a retainer payment to the copyright attorney. *Id.* at *4-5. The copyright attorney then entered a formal notice of appearance on behalf of the plaintiff. *Id.* at *3. Several months later the copyright attorney asked to withdraw as counsel and stated that he sought to assert a retaining lien for unpaid fees. *Id.* at *6. The plaintiff argued that she had never agreed to pay anything other than the original $10,000 retainer. *Id.* at *8.

Note that in this regard the facts in *Bretillot* are quite dissimilar from the facts in this case. Although the plaintiff in *Bretillot* disputed the payment obligation, the plaintiff had in fact made the original retainer payment and there was no explicit agreement, as there was here, that the

15

plaintiff would have no obligation to pay fees. The court also held that under the circumstances of that particular case the attorney could assert a retaining lien. *Id.* at \*27.

My understanding of the *Bretillot* ruling is that under the circumstances of that case -- where there was no explicit agreement as to the client's responsibility for the payment of fees, but where the client knew of the attorney's retention, knew of the attorney's involvement, and paid the original retainer, and where there had been a close working relationship between the plaintiff and the copyright attorney -- it was reasonable to impose the burden on the plaintiff to ensure that payment was made and, therefore, to permit the retaining lien to be asserted.

Seyfarth argues that I should interpret the *Bretillot* decision as permitting a retaining lien whenever there is close contact between counsel and a represented party, even if there is an explicit agreement that the client has no obligation to pay fees, and that I should conclude that *E.W. Howell* and *Brenner* only apply in the event that there is limited contact between the client and the attorney. However, I know of no reasonable basis on which the amount of contact between the client and the attorney should make any difference where (as in this case) the parties have expressly and clearly agreed that the client would not have a payment obligation. The notion, for example, that in *E.W. Howell* or in *Brenner* the retaining lien could have been asserted, if only the attorney had had more frequent telephone calls with the insured defendants, finds no support whatsoever in those decisions. The relevant factor in each of those decisions was that it was clear that the client had no payment obligation.

Perhaps the amount of contact with counsel may be a relevant factor where the terms of an attorney's retention are disputed and where it is unclear whether the client did or did not take on a payment obligation, as in *Bretillot*. But whatever relevance the contact between counsel and the

16

client might have in other cases like *Bretillot*, there is no reason why it should make any difference where the agreement of the parties is clear, as it is in this case.

Seyfarth has cited no other authorities that would permit the assertion of a retaining lien in the face of the agreement that it made in this case, and the Court knows of none.

I should note, in addition to all of the foregoing, that there are very good reasons why the Court should be especially careful about permitting a retaining lien in a bankruptcy case such as this. If Blue Dog were not in bankruptcy, and if it were clearly solvent, then one might argue that Ms. Slavutsky would have been the person who would primarily benefit from the underlying litigation. However, Blue Dog is in bankruptcy. It has no real assets. It will not be a solvent entity unless the litigation with the landlord succeeds, and succeeds in a very big way. The creditors of Blue Dog have first call on any assets of Blue Dog, including the fruits of any litigation, and the creditors' claims have priority other any rights that Ms. Slavutsky would have as Blue Dog's equity owner. A failure by Ms. Slavutsky to honor her obligations to the Seyfarth firm, if it were to result in an inability by Blue Dog to proceed with its litigation, would affect not just Ms. Slavutsky but also all of the creditors of Blue Dog, including other professionals. In other words, the consequences of the proposed assertion of a retaining lien are not limited to Ms. Slavutsky or even to Ms. Slavutsky and Blue Dog.

I have had numerous instances in which attorneys have been retained subject to payment arrangements similar to this one. They may have many reasons why they elect to do so, but where they do I should not allow the owner's alleged failures to pay to affect the estate adversely, and potentially to affect other creditors adversely, unless it was clear from the outset that there was such a risk. Here, the opposite was clear, at least to me. The Debtor was not to bear the cost or burdens associated with the need to pay counsel. Allowing a retaining lien would in effect impose

17

a burden on the debtor and would be inconsistent with the terms on which the retention was presented to me.

Seyfarth argues in its papers that the retaining lien gives it leverage in its dispute with Ms. Slavutsky and that Seyfarth should be allowed to keep that leverage even if it adversely affects Blue Dog. However, one need look no further than what that leverage is being used to try to accomplish to realize that it is inappropriate. Here, the leverage has been used to attempt to force Blue Dog itself to agree to modify the agreed terms under which the Seyfarth firm was retained, and to agree after the fact to take on liability for potentially more than $500,000 in fees. Seyfarth has no right to change that court-approved retention agreement, and its argument that it should be entitled to leverage in seeking to do so rings hollow.

Finally, the Seyfarth firm has also contended that it created some files at a time that predated this bankruptcy case and that those files allegedly do not belong to the Debtor but instead belong to Ms. Slavutsky. However, Seyfarth acknowledges in its motion for permission to withdraw, paragraph 27, that all of its invoices were paid in full up through November 2016. Motion for Leave to Withdraw as Counsel at 10, *Blue Dog at 399 Inc. v. BP 399 Park Avenue LLC*, ECF No. 79 (15-10694-MEW). It is only the ones since then that have not been paid. There is no way, then, that the unpaid work was done when the Seyfarth firm represented Ms. Slavutsky as opposed to when it represented Blue Dog.

Furthermore, there is no indication that during the conduct of the litigation any files were ever divided between those that allegedly belonged to Ms. Slavutsky from a prior time and those that belong to Blue Dog. Instead, the litigation proceeded with all files made available to Blue Dog and to the litigation of Blue Dog's case. In that process they were made part of Blue Dog's file, part of the new retention, and part of the pursuit of Blue Dog's litigation, and that was effective

18

throughout the litigation.  There is, therefore, no basis to withhold any files on the theory that they somehow are not part of the files from the Blue Dog retention.  They became part of the Blue Dog file when the retention was approved, and Blue Dog has a right to them.

Without proof that the Debtor itself owes an unpaid obligation to Seyfarth, and without proof that there is any principled basis on which files could or should be divided somehow between those that purportedly belong to Ms. Slavutsky as opposed to the Debtor, I would require that Seyfarth turn over all of the files if I were to approve a withdrawal of the Seyfarth firm.

But to be very clear about this, I do not want anyone to think that I have approved the application to withdraw as counsel or that any of the foregoing discussion is just about what the consequences would be upon such a withdrawal.  Instead, I want to make abundantly clear that I will not approve the motion to withdraw as counsel unless it is accompanied by an explicit and unconditional agreement by the Seyfarth firm that all of its files will be immediately turned over, with no exceptions.

When Seyfarth agreed to be retained by the Debtor it became subject to Local Rule 2090-1(e), which permits withdrawal only upon order of the court for cause shown.  LBR 2090-1(e).  I will not permit Seyfarth's disputes with Ms. Slavutsky to harm the Debtor or to impose obligations on the Debtor that the Debtor was never supposed to bear, or to disable the Debtor from completing the pending litigation.  This matter was scheduled for trial after a prolonged pretrial period and the relevant space has been in a state of disuse while this case has proceeded.  If there is no settlement with the landlord there needs to be a trial and it needs to happen soon in order to be fair to all of the parties in that case.

As a result, in the absence of a complete and unrestrained turnover of all files I will expect the Seyfarth firm to continue as counsel.  In that capacity I will expect and require the Seyfarth

firm to work diligently on the Debtor's behalf, including providing full cooperation and sharing of its work product with co-counsel, all based on the original understanding that the Debtor would not have a financial obligation for the fees that were incurred.  If Seyfarth has difficulties communicating with Ms. Slavutsky it will have to work that out using other counsel as an intermediary, if necessary.  Or if Ms. Slavutsky's conduct presents an insuperable obstacle to the presentation of the case the affected parties may ask for the appointment of a trustee.  One way or another, however, this case will be brought to resolution and a trial will proceed.

After the announcement of the foregoing decision, the Court entered a separate order that reflected Seyfarth's decision to withdraw and to turn over files as a condition to withdrawal.

Dated:  New York, New York
      July 21, 2017

           **s/Michael E. Wiles**
           HONORABLE MICHAEL E. WILES
           UNITED STATES BANKRUPTCY JUDGE